**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| LEAGUE OF UNITED LATIN AMERICAN CITIZENS; TEXAS LEAGUE OF UNITED LATIN AMERICAN CITIZENS; LEAGUE OF UNITED LATIN AMERICAN CITIZENS COUNCIL 102; and COMMON CAUSE,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT S. HOWDEN, in his official capacity as the Texas Secretary of State; PAUL ADAMS, in his official capacity as Dallas County Elections Department; FRANK PHILLIPS, in his official capacity as Denton County Elections Administrator; and KALEB BREAUX, in his official capacity as Collin County Elections Administrator,<br><br>Defendants. | Case No.: 1:26-CV-00729<br><br><br>FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF |

**Deleted:** _____

**Deleted:** JANE NELSON

**Deleted:** her

**Deleted:** ; JOYCE HUDMAN, in her official capacity as Brazoria County Clerk

**PRELIMINARY STATEMENT**

1. The State of Texas has undertaken a troubling voter purge program that relies on unvetted, outdated citizenship data to remove voters from rolls in ways that are discriminatory and non-uniform across counties. The Purge Program discriminates against and removes naturalized, derived, and acquired U.S. citizens, despite the State having records demonstrating that many purged voters are U.S. citizens. In order to maintain their ability to vote, many non-U.S. born citizens wrongfully targeted by this program have been forced to prove their citizenship, a step not required of their U.S.-born peers.

2. Ensuring that every eligible U.S. citizen has the opportunity to vote is fundamental to American democracy. U.S. citizens born abroad are entitled to the same voting rights and protections as every other U.S. citizen.

1

3.  Plaintiffs bring this action to vindicate rights under the National Voter Registration Act ("NVRA") against unlawful voter purges that have and will continue to harm naturalized U.S. citizens and U.S. citizens with acquired and derived citizenship.

4.  Voter purge efforts relying upon faulty citizenship data and conducted outside of the requirements established by Congress risk relegating American citizens born abroad to a second-class status where their right to vote is neither protected nor guaranteed.

5.  Seven years ago, the State of Texas engaged in a similar, disastrous, and "ham-handed" voter purge that discriminatorily threatened the voter registrations of tens of thousands of naturalized citizens based on stale Department of Public Safety ("DPS") citizenship data.[1] Ultimately, the process was so fatally flawed that the State abandoned it in a settlement. *See* Exhibit A-1, Settlement Agreement, *Texas League of United Latin Am. Citizens v. Whitley*, No. 5:19-cv-74 (W.D. Tex. Apr. 26, 2019). Texas further agreed to develop, implement, and offer increased transparency around a new, nondiscriminatory list-maintenance process.

6.  Rather than learning from past mistakes, in 2025, Texas again implemented a voter purge program that relies upon flawed citizenship data and runs afoul of Congress's framework for protecting the fundamental right to vote ("Purge Program"). Like its predecessor, the revived Purge Program is unlawful, violating the NVRA.

7.  To facilitate the Purge Program, then-Secretary of State Jane Nelson undertook a comparison of Texas voter registration lists with United States Citizenship Services' ("USCIS") Systematic Alien Verification for Entitlements ("SAVE") records. On October 20, 2025, then-Secretary Nelson announced that her office had "completed a full comparison of the state's voter registration list against citizenship data" in SAVE and provided the names of alleged noncitizens to Texas counties for removal. *See* Exhibit A-2, *Texas Completes Citizenship Verifications in the SAVE Database*, Texas Sec'y of State

---

[1] Order Denying Motion to Dismiss, *Texas League of United Latin Am. Citizens v. Whitley*, No. 5:19-cv-74 (W.D. Tex. Feb. 27, 2019), ECF No. 61.

**Deleted:** Defendant

**Deleted:** compared

**Deleted:** Defendant

**Deleted:** of State

**Deleted:** B

(Oct. 20, 2025). Many U.S. citizens have been wrongfully purged from Texas's voter rolls as a result.

8. The SAVE System was not designed as a voter registration tool. But the federal government overhauled the SAVE System in a half-baked attempt to transform it into a citizenship-verification database.[2] In the rush to create a national citizenship database, USCIS, a component of the Department of Homeland Security ("DHS"), relied on data sources that are known to be stale, unreliable, and incomplete. Voting rights experts and state officials have expressed concerns that USCIS did not conduct data validation to determine whether these datasets were reliable for citizenship verification nor did it adequately test the system to confirm that these disparate data sources could be properly matched.[3] Instead, USCIS allowed states, including Texas, to begin using SAVE for voter verification while the agency knew of SAVE's shortcomings and inaccuracies, and as USCIS continued trying to tweak the new SAVE System to add additional data sources to address those problems.[4]

9. The result is a SAVE System that consistently provides incomplete and unreliable information during citizenship checks for voter verification, particularly for naturalized, acquired, and derived citizens.[5] USCIS officials have acknowledged that SAVE cannot

---

[2] Press Release, USCIS, *USCIS Enhances Voter Verification Systems* (Nov. 3, 2025), https://perma.cc/9LN5-SEDU ("USCIS Enhances Voter Verification Systems"); Jude Joffe-Block, *Trump's SAVE tool is looking for non-citizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025), https://perma.cc/QC7L-XQZU.

[3] Jasleen Singh & Spencer Reynolds, *Homeland Security's "SAVE" Program Exacerbates Risks to Voters*, Brennan Ctr. for Just. (July 21, 2025), https://perma.cc/HN98-8N2Q.

[4] Jen Fifield & Zach Despart, *A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas.*, The Texas Trib. (Feb. 13, 2026), https://perma.cc/XKE2-YMNQ.

[5] A "derived" citizen refers to an individual born outside of the U.S. who automatically becomes a U.S. citizen at birth by operation of law where: (1) the person is the child of a parent who is a U.S. citizen by birth or becomes a U.S. citizen through naturalization, (2) the child is under 18 years old, (3) the child is a lawful permanent resident, and (4) the child is residing in the U.S. in the legal and physical custody of the U.S. citizen parent. *See Policy Manual, Chapter 4 - Automatic Acquisition of Citizenship after Birth (INA 320)*, USCIS (Aug. 29, 2026), https://perma.cc/L95Q-H2HL ("USCIS Policy Manual"). An "acquired" citizen refers to an individual who is a lawful permanent resident and becomes a citizen because one or both parents is a citizen or becomes a

always find current citizenship data for people born outside of the U.S. but said that it is ultimately up to states to decide how to use SAVE data and to determine whether individuals flagged by the SAVE System should be removed from the voter rolls. *See infra* ¶ 118.

10.    In turn, then-Texas Secretary of State Nelson chose to use this data—without any evidence of its reliability or transparency into its origins—to begin a voter purge without checking its own available sources of citizenship data.

11.    The Texas Secretary of State's Office has access to DPS records containing citizenship information for many of the voters flagged as noncitizens in Texas's SAVE search. DPS maintains copies of the proof of citizenship documents provided by individuals who register to vote while obtaining a driver's license or state identification card. DPS also maintains copies of the proof of lawful presence documents, such as green cards, provided by immigrants who apply for a state identification card.

12.    Despite the availability of these DPS records and the documented problems with SAVE data, then-Secretary Nelson did not take any additional steps to verify the lists of potential noncitizens provided by SAVE before sending them to counties to begin purging voters. Nor did then-Secretary Nelson instruct county officials to consult citizenship data gathered by DPS before taking steps to purge voters flagged by the SAVE search.

13.    Rather, based on the results of the SAVE search alone, the Secretary of State claimed to have identified noncitizens on the voter rolls and sent voter lists of alleged noncitizens to county elections officials ("Purge Lists").

14.    Unsure of how to respond to its sudden launch, counties have implemented the Purge Program in different, non-uniform ways throughout the state, with some counties taking no action in response to the Purge Lists; others sending notices to all those on the Purge Lists with no investigation; and others undertaking investigations and purging voters.

---

citizen through the naturalization process. *See* 8 U.S.C. § 1431 (as amended by the Child Citizenship Act of 2000).

| Deleted: 120 |
| Deleted: the |
| Deleted: Defendant |
| Deleted: of State |
| Deleted: Defendant |
| Deleted: of State |
| Deleted: Defendant |

15. Some counties elected to undertake further investigation of the Purge Lists, including by asking Defendant Secretary of State for assistance accessing citizenship data contained in DPS records. In some of those counties, voters included on the Purge Lists were identified as citizens who had registered to vote with DPS and therefore provided proof of citizenship during the voter registration process.

16. However, many counties did not consult DPS or any other records outside of the Purge Lists and SAVE data prior to implementing the Purge Program.

17. As a result, the Purge Program has predictably identified many lawfully registered naturalized citizens as unlawfully registered noncitizens.

18. Because the Purge Program relies exclusively on the SAVE System—a database that is known to contain unreliable citizenship data that will systematically burden non-U.S. born citizens—to generate Purge Lists and to purge voters in a discriminatory and non-uniform manner, it irreparably harms Plaintiffs' members.

19. The Purge Program violates Section 8(b) of the NVRA because it is both non-uniform and discriminatory. The Purge Program relies on database searches that will result in disproportionate rates of eligible naturalized, acquired, and derived citizens being purged from the voter rolls, while ignoring data in the State's own possession that shows these results to be inaccurate. The Purge Program therefore causes the State's list maintenance program to have predictably discriminatory results. 52 U.S.C. § 20507(b)(1). In addition, the application of the Purge Program is non-uniform, because different counties have acted differently towards those identified on the Purge Lists.

20. Plaintiffs respectfully request that the Court enjoin Defendant Secretary of State and Defendant counties from continuing to instruct election administrators to use the challenged Purge Program.

**Deleted:** ,

**JURISDICTION AND VENUE**

21. This action is brought pursuant to 52 U.S.C. § 20510(b), which provides that "[a] person who is aggrieved by a violation of [the NVRA] may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation."

> **Deleted:** ," as well as 42 U.S.C. § 1983.

22. This Court has jurisdiction pursuant to 28 U.S.C. § 1331. It is authorized to issue declaratory and injunctive relief under 28 U.S.C §§ 2201-02, Rules 57 and 65 of the Federal Rules of Civil Procedure, and the Court's inherent equitable powers.

23. This Court has personal jurisdiction over the Secretary of State in his official capacity because he is a citizen and elected officer of the State of Texas and his principal place of business is in Texas.

> **Deleted:** Defendant Nelson
> **Deleted:** her
> **Deleted:** she
> **Deleted:** her

24. This Court has personal jurisdiction over each of the County Defendants because they are citizens and elected officers of the State of Texas and their principal places of business are in Texas. Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants reside in this judicial district and a substantial part of the events and omissions alleged occurred and will occur in this district.

**PARTIES**

25. Plaintiff **League of United Latin American Citizens ("LULAC")** is the oldest and largest national Latino civil rights organization in the United States. It is a nationwide, non-profit non-partisan membership organization with over 325,000 members in twenty-seven states, the District of Columbia, and Puerto Rico. LULAC was established in 1929 and has its headquarters in Washington, D.C.

26. LULAC advances the economic condition, educational attainment, political influence, housing, health, and civil rights of Hispanic Americans through community-based programs operating at more than 525 LULAC councils nationwide. LULAC has been recognized and accepted as an organizational plaintiff with Article III standing to protect Latino rights in federal courts across the country, including the United States Supreme

Court and the Western District of Texas. *See, e.g.*, *LULAC v. Perry*, 548 U.S. 399, 446-47 (2006) (holding that Texas District 23 violated Section 2 of the Voting Rights Act based on LULAC's representation of constituent voters); *La Union del Pueblo Entero v. Abbott*, 614 F. Supp. 3d 509, 517-29 (W.D. Tex. 2022), *aff'd*, 151 F.4th 273, 290 (5th Cir. 2025) (holding LULAC had associational and organizational standing to sue); *Perez v. Abbott*, 250 F. Supp. 3d 123, 200 (W.D. Tex. 2017) (holding LULAC had standing to bring claim).

27. LULAC's members are civically engaged and many of them are registered voters. Approximately 70% of its members are registered to vote. Nearly 80% of its registered members voted in 2020, and around 62% voted in 2022.

28. LULAC's membership includes non-U.S. born citizens who are registered to vote in the State of Texas and who are acutely at risk of being erroneously removed from the voter rolls or have already been removed due to the Purge Program.

29. Voter registration activity is key to LULAC's mission of increasing civic participation and ensuring every eligible citizen is registered and active in the democratic process. In addition to general registration activities, LULAC also conducts voter registration drives on a volunteer basis and creates digital voter registration toolkits to assist eligible voters seeking to register.

30. The Purge Program will hamper LULAC's core voter registration and engagement efforts by threatening the registration status of those they register and seek to activate to vote. As a result, the Purge Program will force LULAC to divert resources to mitigate the Program's effects and to educate LULAC's constituents and members—especially non-U.S. born citizen voters—on how to respond to unlawful removals and how to attempt to re-register to vote.

31. The strain on LULAC's capacity is particularly acute as it relates to serving naturalized citizens, who are especially vulnerable to being improperly flagged and removed under Texas's Purge Program because they were previously recorded as noncitizens in the SAVE System.

7

32.  LULAC does not have unlimited resources and thus must make difficult decisions about how it expends resources and for whom. The Purge Program requires LULAC to devote time and resources to avoid—and attempt to correct—wrongful voter removals rather than expending those resources on LULAC's other critical voter registration and voter engagement work.

33.  With the implementation of the Purge Program, LULAC will also have to audit its voter education materials and review its councils' materials. LULAC will have to expend resources to revise all of its informational materials and guidance to warn about the risk of removals under the Purge Program, including materials on its website, printed materials, and social media accounts. LULAC will also have to educate and train its volunteers to equip them with the knowledge and tools to address wrongful removals under the Purge Program. LULAC will also have to translate its materials into multiple languages.

34.  Plaintiff **Texas League of United Latin American Citizens ("Texas LULAC")** is a state chapter of LULAC. Texas LULAC operates under the national LULAC mission, which includes conducting voter registration and engagement activities aimed at increasing civic participation among Latino voters. Texas LULAC dedicates significant time and resources to these activities.

35.  Texas LULAC's members include non-U.S. born citizens. If Defendants continue to engage in this unlawful and discriminatory Purge Program, Texas LULAC will be forced to divert critical resources to educate the community about the Purge Program and assist its members in responding to improper notices threatening cancellation of their voter registration.

36.  Texas LULAC's non-U.S. born citizen members who are registered voters are acutely at risk of being erroneously removed from the voter rolls because of the Purge Program's reliance on incomplete and inaccurate citizenship data.

37. Texas LULAC's ability to encourage voter registration and engagement by newly naturalized citizens is likely to be hindered by the Purge Program because Texas has intentionally targeted naturalized citizens for disenfranchisement.

38. Plaintiff **League of United Latin American Citizens Council 102 ("LULAC Council 102")** is a Dallas-based council of LULAC. LULAC Council 102 operates under the national LULAC mission, which includes conducting voter registration and engagement activities aimed at increasing civic participation among Latino voters. LULAC Council 102 commits significant time and resources to these activities.

39. LULAC Council 102 members include non-U.S. born citizens. If Defendants continue to engage in this unlawful and discriminatory Purge Program, LULAC Council 102 will be forced to divert its already limited resources to educate the Dallas community about the Purge Program and to assist its members in responding to improper notices threatening cancellation of their voter registration.

40. LULAC Council 102's non-U.S. born citizen members who are registered voters are acutely at risk of being erroneously removed from voter rolls because of the Purge Program.

41. LULAC Council 102's ability to encourage voter registration and engagement by newly naturalized citizens is likely to be hindered by Defendants' intentional targeting of naturalized citizens because Texas has targeted these populations for disenfranchisement.

42. Plaintiff **Common Cause ("Common Cause")** is a non-profit, non-partisan organization with more than 898,000 members nationally and more than 39,240 members in Texas.

43. Common Cause is a grassroots organization dedicated to empowering Americans, including Texans, to increase their civic participation and make their voices heard in the political process. Common Cause has a state director in Texas and members who live across Texas and include non-U.S. born citizens. Through its members in Texas, Common Cause works to create open, honest, and accountable government that serves the public interest, including by protecting voting rights and promoting voter participation. Courts

have routinely found that Common Cause has organizational and associational standing. *See, e.g.*, *Common Cause Indiana v. Lawson*, 937 F.3d 944, 951 (7th Cir. 2019); *Ga. State Conf. of the NAACP v. Georgia*, No. 1:21-CV-05338-ELB-SCJ-SDG, 2023 WL 7093025, at *4 (N.D. Ga. Oct. 26, 2023).

44.    Common Cause's members include registered voters in Texas. At least 50% of Common Cause members in Texas are registered to vote in Texas. At least 48% of Common Cause Texas members voted in the 2024 general election, and at least 46% of Common Cause Texas members voted in the 2020 general election. Additionally, many of its members are naturalized citizens who are registered to vote in the State of Texas and are especially vulnerable to being improperly flagged and removed under Texas's Purge Program because they were previously recorded as noncitizens in the SAVE System and who are acutely at risk of being erroneously removed from the voter rolls due to the Purge Program.

45.    At least one Common Cause Texas member has already been erroneously flagged for removal from the voter rolls as a result of the Purge Program. Like many other Common Cause Texas members, this individual is a naturalized citizen and eligible voter that has current proof of citizenship on file with DPS. Voter registration activity is key to Common Cause's work to protect voting rights and election integrity. In addition to directly registering voters, Common Cause also educates the public around voter registration, including information on when deadlines occur, what to do in the event of registration-related problems, and how Texas laws differ from other states. In addition, Common Cause has worked to pass legislation to make voter registration easier and more accurate, including by advocating for online voter registration, automatic registration, shortening the period between the voter registration deadline and Election Day, and improving compliance with the Texas high school voter registration law that is supposed to require schools to offer voter registration to qualified students twice a year.

46.    The Purge Program will hamper Common Cause's core voter registration and engagement efforts by threatening the registration status of voters and adding barriers to register or

maintain registration. Common Cause will be forced to divert additional resources to mitigate the Program's effects and educate voters, especially naturalized citizen voters, on how to provide unnecessary proof of citizenship or attempt to re-register in time to vote.

47.    The Purge Program will put a strain on Common Cause's resources as it will be forced to divert resources to educating its members, which may include naturalized citizens who are vulnerable to being improperly flagged and removed under Texas's Purge Program because they were previously recorded as noncitizens in one of the databases accessible through the SAVE System, which is known to contain stale and incomplete citizenship information.

48.    Because it does not have unlimited resources, Common Cause must divert time and resources budgeted for its other activities, including but not limited to, organizing petition campaigns directed to state and local government officials, letter-writing and phone-banking campaigns, town halls, workshops and rallies.

49.    With the implementation of the Purge Program, Common Cause will also have to audit its voter education materials and review its materials that are distributed in the State. Common Cause will have to expend resources to revise all of its informational materials and guidance to warn about the risk of removals under the Purge Program, including materials on its website, printed materials, and social media accounts. It will also have to provide education and training materials to its volunteers to equip them to address erroneous removal notices and wrongful removals under the Purge Program. Common Cause will also have to translate these materials into multiple languages.

50.    Common Cause also does election protection work in Texas by recruiting and training volunteers who answer questions from callers on Election Day who experience problems when voting. Due to the Purge Program, Common Cause will have to expend more resources to recruit and train more volunteers to assist with its election protection program in Texas to address the surge in questions from individuals who are purged or received notices of removals under the Purge Program.

11

51.    Defendant **Robert S. Howden** is the Secretary of State of Texas. He was appointed to replace former Secretary of State Jane Nelson, effective July 18, 2026. He is the chief election officer of the State of Texas and is responsible for overseeing voter registration and election administration throughout the State. *See* Tex. Elec. Code § 31.001.

52.    In his official capacity, the Texas Secretary of State oversees the conduct of local elections, the operation of voting sites, and the State's obligations under the NVRA, including maintaining voter registration lists. *See* Tex. Elec. Code § 31.001. As part of these responsibilities, the Secretary is responsible for adopting rules for removing ineligible voters and for ensuring that eligible voters can register to vote and remain registered. The Secretary is also responsible for ensuring that the State and its local boards of elections comply with Section 8 of the NVRA. *See* 52 U.S.C. § 20509; *see also* Tex. Elec. Code § 31.004.

53.    The Secretary of State's office is located at 1019 Brazos St., Austin, Texas 78701. Secretary Howden is sued in his official capacity.

54.    Defendant **Kaleb Breaux** is the County Elections Administrator for Collin County, Texas. He is the chief elections officer of the County and is responsible for holding elections, conducting voter registration, performing voter list maintenance, and maintaining elections records. *See* Tex. Elec. Code § 31.043.

55.    In his official capacity, Defendant Breaux is responsible for removing ineligible voters from the voter rolls and for ensuring that eligible voters can register to vote and remain registered.

56.    The Collin County Elections Administration Office is located at 2010 Redbud Blvd., Suite 102, McKinney, Texas 75069.

57.    Defendant **Paul Adams** is the County Elections Administrator for Dallas County, Texas. He is the chief elections officer of the County and is responsible for holding elections, conducting voter registration, performing voter list maintenance, and maintaining elections records. *See* Tex. Elec. Code § 31.043.

12

**Deleted:** Jane Nelson

**Deleted:** She

**Deleted:** her

**Deleted:** Nelson

**Deleted:**  Nelson

**Deleted:** She

**Deleted:** A.

**Deleted:** Nelson's

**Deleted:** Nelson

**Deleted:** her

**Deleted:** <#>Defendant **Joyce Hudman** is the County Clerk for Brazoria County, Texas. She is the chief elections officer of the County and is responsible for holding elections, conducting voter registration, performing voter list maintenance, and maintaining elections records. *See* Tex. Elec. Code § 31.043.¶
In her official capacity, Defendant Hudman is responsible for removing ineligible voters from the voter rolls and for ensuring that eligible voters can register to vote and remain registered.¶
The Office of the Brazoria County Clerk is located at 111 E. Locust, Ste 200, Angleton, Texas 77515.¶

58.    In his official capacity, Defendant Adams is responsible for removing ineligible voters from the voter rolls and for ensuring that eligible voters can register to vote and remain registered.

Deleted: Hudman

59.    The Office of the Dallas County Elections Department is located at 1520 Round Table Drive, Dallas, Texas 75247.

60.    Defendant **Frank Phillips** is the County Elections Administrator for Denton County, Texas. He is the chief elections officer of the County and is responsible for holding elections, conducting voter registration, performing voter list maintenance, and maintaining elections records. *See* Tex. Elec. Code § 31.043.

61.    In his official capacity, Defendant Phillips is responsible for removing ineligible voters from the voter rolls and for ensuring that eligible voters can register to vote and remain registered.

62.    The Denton County Elections Administration Office is located at 701 Kimberly Drive, Suite A100, Denton, Texas 76208.

## FACTUAL ALLEGATIONS

I.    **Texas has a history of engaging in discriminatory purges based on flawed citizenship data.**

63.    Texas has repeatedly fallen short of its responsibility to create a voter list maintenance program that is nondiscriminatory and accounts for the many non-U.S. born citizens who live in Texas and are entitled to the same voting rights and protections as U.S.-born citizens.

64.    Texas has one of the highest rates of naturalization in the country. Recent statistics from DHS indicate that more than one hundred thousand Texas residents become naturalized U.S. citizens each year.[6]

65.    Texas previously conducted a purge program that discriminated against and threatened to remove eligible naturalized citizen voters, which was so fatally flawed that the State

---

[6] *U.S. Naturalizations: 2022, Annual Flow Report*, Dep't of Homeland Sec., 2, 4 (Nov. 2023), https://perma.cc/U37R-P2N3.

abandoned it in a settlement. *See* Exhibit A-1, Settlement Agreement, *Texas League of United Latin Am. Citizens v. Whitley*, No. 5:19-cv-74 (W.D. Tex. Apr. 26, 2019).

66.    On January 25, 2019, the Secretary of State's office issued an advisory announcing a new voter purge program. The advisory instructed counties to investigate and send removal notices to voters on lists the State transmitted to the counties. The State identified these individuals as noncitizens, despite knowledge of deficiencies in the data used to compile the lists.

67.    The 2019 purge lists were generated using only outdated DPS data, resulting in the erroneous inclusion of tens of thousands of properly registered U.S.-citizens on the purge lists distributed to counties. These voters included naturalized citizens who followed the voter registration process as prescribed but were targeted for removal solely because they had indicated non-citizenship during a DPS transaction at some point prior to registering.

68.    Despite admissions from the Secretary of State's office that the list was "weak," and likely included naturalized citizens, the Texas Attorney General amplified the announcement and attempted to intimidate naturalized citizens by threatening them with criminal investigations.

69.    As Texas officials themselves predicted, the 2019 purge lists included many eligible naturalized citizens. Tens of thousands of eligible Texas voters erroneously received removal notices, and several thousand voters were purged because they did not respond to the State's demands for proof of citizenship within 30 days.

70.    Even as the Secretary of State sent an apology letter to legislators, explaining that its office had discovered that the data was not fully accurate, the Secretary of State continued to pursue the purge program, which was ultimately challenged in lawsuits brought by membership organizations, including Plaintiff Texas LULAC, alleging that the 2019 purge program was discriminatory and imposed an unconstitutional burden on the right to vote. The parties reached a final settlement agreement in April 2019. *See* Exhibit A-1, Settlement

Agreement, *Texas League of United Latin Am. Citizens v. Whitley*, No. 5:19-cv-74 (W.D. Tex. Apr. 26, 2019).

71.    Under the settlement, the Secretary of State agreed to abandon the election advisory and purge program that led to false accusations of widespread noncitizen voter fraud. *Id.*

72.    As part of the agreement, the State is prohibited from relying solely on stale driver's license data to evaluate the citizenship of prospective or current Texas voters. Instead, the State may only rely on driver's license data to flag individuals as alleged noncitizens for removal if the individuals submitted evidence of non-U.S. citizenship to DPS *after* registering to vote. In Texas's own words, the implementation of a voter list maintenance program that avoided reliance on stale citizenship data accomplished its goal of "eliminating the impact of any list maintenance activity on naturalized U.S. citizens."[7] The State further committed to holding itself accountable and to "protect[] the voting rights of eligible Texans."[8]

73.    Following the settlement, the Texas Legislature codified the provisions of the settlement and recognized the dangers of relying on stale citizenship data in conducting voter list maintenance. Specifically, the election code provision addressing cancellation because of citizenship status instructs that registrars "shall consider only a voter's [citizenship] information in the database of the Department of Public Safety that was derived from documents presented by the voter to the department *after* the person's current voter registration became effective, and may not consider information derived from documents presented by the voter to the department before the person's current voter registration became effective." Tex. Elec. Code § 16.0332.

---

[7] Press Release, Texas Sec'y of State, Secretary Whitley Announces Settlement In Litigation On Voter Registration List Maintenance Activity (Apr. 26, 2019), https://perma.cc/7D85-B3GT.
[8] *Id.*

II.     **Texas launches a Purge Program based on citizenship data that the State knows, or should know, is flawed.**

74.    Rather than learn from past mistakes, Texas has once again engaged in a discriminatory Purge Program based on unreliable, incomplete, and unvetted data.

75.    The current Purge Program is based on flawed, stale data that combines information from USCIS and the Social Security Administration ("SSA"), *see infra* Section III.

76.    Based on that flawed data, the Secretary of State instructed counties to demand that voters provide documentary proof of citizenship or risk being purged from the voter rolls.

77.    The Secretary of State failed to conduct any investigation into these voters, including reviewing Texas's own DPS data, which contains documentary proof of citizenship for many registered voters.

A.  **Texas launches a new Purge Program.**

i.     *Texas enters into a Memorandum of Agreement with USCIS*

78.    On March 12, 2025, the Secretary of State's office signed a Memorandum of Agreement with USCIS, "regarding participation in the SAVE program for voter registration and voter list maintenance purposes." *See* Exhibit A-3, Memorandum of Agreement, Dep't of Homeland Security and Texas Sec'y of State (March 17, 2025).

79.    The Memorandum designates the Secretary of State as the "User Agency."

80.    The purpose of the Memorandum of Agreement "is to establish the terms and conditions for the User Agency's participation in SAVE to verify the citizenship and immigration status information of noncitizen and naturalized or acquired U.S. citizen registrants and registered voters within User Agency's jurisdiction for voter registration and voter list maintenance (benefit) in the State of Texas." *Id.* at 2.

81.    The Memorandum explains that SAVE will verify the information that the Secretary of State provides "against DHS-accessed" records. *Id.*

82.    The Memorandum requires that the Secretary of State, as the User Agency, must "institute additional verification when required by SAVE for any registrant or registered voter that

Deleted: Defendant
Deleted: instructs
Deleted: Defendant
Deleted: fails
Deleted: Defendant
Deleted: C
Deleted: Defendant
Deleted: Defendant
Deleted: Defendant

does not verify as a naturalized or acquired citizen on initial verification, including in all cases where the User Agency receives any SAVE response other than that of naturalized or acquired citizen." *Id.* at 4.

83. It is unclear whether Texas complied with this requirement when it ran its list of registered voters through SAVE.

84. In June 2025, the federal government issued a new iteration of the Memorandum. *See* Exhibit A-4, Template Memorandum of Agreement (June 9, 2025).

85. Upon information and belief, the Secretary of State signed an updated version of the Memorandum.

### ii. *Texas launches its Purge Program using the SAVE System*

86. On October 20, 2025, then-Secretary Nelson announced that her office had "completed a full comparison of the state's voter registration list against citizenship data" in SAVE. *See* Exhibit A-2, *Texas Completes Citizenship Verifications in the SAVE Database*, Texas Sec'y of State (Oct. 20, 2025).

87. Texas completed its upload using the newly available bulk upload feature, which allowed the Secretary of State's office to systematically match information on all 18 million of Texas's registered voters in the SAVE System, though Texas never saw any of the underlying documents that were relied on to determine citizenship within the SAVE System.

88. Then-Secretary Nelson explained that SAVE had identified "2,724 potential noncitizens who are registered to vote in Texas," and that, "[l]ast week those voter files were provided to Texas counties, who will now conduct their own investigations into the eligibility of these voters. . . . Once that process is complete, individuals who are deemed noncitizens that voted in a Texas election will be referred to the Office of the Attorney General."[9]

---

[9] *Id.*

**Deleted:** D

**Deleted:** Defendant

**Deleted:**  has

**Deleted:** Defendant

**Deleted:** of State

**Deleted:** B

**Deleted:** Defendant

**Deleted:** Defendant

**Deleted:** of State

**Deleted:** .

89.    The next day, on October 21, the Secretary of State issued a Directive to election officials to notify them that on October 16 the State had forwarded Purge Lists of purported noncitizens on the voter rolls to county election officials, who were then expected to conduct their own investigations into the eligibility of voters SAVE had flagged.[10] Exhibit A-5, Email from Sec'y of State to Voter Registrars and Election Administrators (Oct. 21, 2025).

90.    But in the Directive, the Secretary of State instructed that counties should follow a similar process to the one "outlined in Election Advisory No. 2021-11: List Maintenance Activity Involving Potential Non-United States Citizens," *id.*, such that a voter's presence on a Purge List is "reason to believe that the voter is no longer eligible for registration if the county's independent investigation does not demonstrate that the individual is a U.S. citizen," and on that basis, the officials should send a notice indicating that the official is investigating the voter's status. *See* Exhibit A-6, Election Advisory No. 2021-11, Texas Sec'y of State (Sep. 9, 2021). The Directive did not instruct county election officials to take any specific investigatory steps, such as consulting available DPS data, before removing voters.

91.    The Directive contained no limitation on when the counties may purge people from the voter rolls, permitting the counties to purge voters who were on the Purge Lists any time up until the eve of the election. *Id.*

92.    Election Advisory No. 2021-11, referenced in the Directive, states that "if a voter registrar has reason to believe that a person is no longer eligible for registration, the registrar must notify the voter in writing that their registration status is being reviewed." *See* Exhibit A-6, Election Advisory No. 2021-11, Texas Sec'y of State (Sep. 9, 2021). Then, "a voter can prove U.S. citizenship in several ways, including by presenting a copy of: U.S. birth certificate; Consular Report of Birth Abroad of a Citizen of the United States issued by the

---

[10] Jude Joffe-Block, *Trump's SAVE tool is looking for noncitizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025), https://perma.cc/QC7L-XQZU.

18

**Deleted:** Defendant

**Deleted:** E

**Deleted:** Defendant

**Deleted:** F

**Deleted:** F

United States Department of State; U.S. passport; Certificate of naturalization of the voter; Certificate of naturalization of the voter's parent (along with the voter's foreign birth certificate) that allowed the voter to become a U.S. citizen while he or she was a minor; or Any other form prescribed by the Secretary of State." *Id.* If the voter does not provide such proof of citizenship within 30 days after the notice is sent, "[t]he voter registrar *must* cancel the voter's registration." *Id.* (emphasis added)

93.     To facilitate removal of voters on the Purge Lists, then-Secretary Nelson created a new template notice for county voter registrars to require proof of citizenship documentation for voters identified as potential noncitizens on Purge Lists (the "SAVE Non-Citizenship Notice" or "Notice"). *See* Exhibit A-7, Notice to Registered Voter for Proof of Citizenship (USCIS Verification), Texas Sec'y of State (Oct. 2025).

94.     The Notice states that "[a] comparison of the information in your voter registration records with the United States Citizenship and Immigration Services SAVE records show that you were not a United States citizen at the time of the comparative process." *See id.*

95.     The Notice then informs the recipient that they must provide documentary proof of citizenship to the county registrar in the form of a U.S. birth certificate or consular report of birth abroad, a United States passport, a Certificate of Naturalization or Certificate of Citizenship, or a parent's Certificate of Naturalization along with the recipient's birth certificate if the recipient became a U.S. citizen as a result of their parent's naturalization. *See id.*

96.     Recipients have only 30 days to respond, and if the county registrar does not receive documentary proof of citizenship within 30 days, their voter registration "will be cancelled." *Id.*

97.     If a voter provides the requested documentary proof of citizenship, "the county must send a copy of that documentation to the Secretary of State's office to be provided to USCIS." Exhibit A-5, Email from Sec'y of State to Voter Registrars and Election Administrators (Oct. 21, 2025).

19

Deleted: Defendant

Deleted: of State

Deleted: G

Deleted: E

### B. Texas knows or should know that SAVE is seriously flawed.

#### i.   *The SAVE System was not created to verify citizenship*

98.   The original SAVE System was created in 1986 to allow government agencies to verify whether noncitizens are eligible for certain government benefits. *See* Pub. L. No. 99-603, title I, § 121(a)(1)(C), 100 Stat. 3359, 3384-86 (1986) (codified at 42 U.S.C. § 1320b-7(d)) (section titled "Verification of Immigration Status of Aliens Applying for Benefits under Certain Programs"); *id.* §121(c)(1), 100 Stat. at 3391 (codified at 42 U.S.C. § 1320b-7 note) ("The Commissioner of Immigration and Naturalization shall implement a system for the verification of immigration status under . . . [42 U.S.C. § 1320b-7(d)(3)], (4)(B)(i) of this section . . . so that the system is available to all the States by not later than October 1, 1987.").

99.   The original SAVE System was a limited and narrow system meant to fit its specific use of verifying whether noncitizens were eligible for benefits. SAVE could not run queries of U.S.-born citizens, because SAVE could only verify the "citizenship and immigration status of an immigrant, nonimmigrant, and certain naturalized and derived U.S. citizens."[11] SAVE searches required DHS-assigned immigration numbers and only accessed immigration-related records and did not rely on any Social Security data.[12] SAVE searches could be conducted only on an individualized basis.[13]

100.   The original SAVE Systems had documented errors and lags in information on naturalized, derived, and acquired citizens, as well as other accuracy problems that have been true since its inception.

---

[11] *Privacy Impact Assessment for the Systematic Alien Verification Entitlements Program, DHS Ref. No. DHS/USCIS/PIA-006(c)*, Dep't of Homeland Sec., 2-3 (June 30, 2020), https://perma.cc/HU2M-NTL8 ("2020 SAVE PIA").

[12] *Id.* at 2.

[13] Privacy Act Notice of Modified System of Records, 85 Fed. Reg. 31798, 31801 (May 27, 2020) ("2020 SAVE SORN").

101.    In recent years, some states have begun using the SAVE System to attempt to verify the citizenship of people on their voter rolls for list maintenance purposes, but those states have repeatedly run into severe accuracy issues.

102.    For example, the North Carolina State Board of Elections determined in its audit of the 2016 election that, "based on past experience," a "match with the SAVE database is not a reliable indicator that a person is not a U.S. citizen because the database is not always updated in a timely manner and individuals who derived citizenship from their parents through naturalization or adoption may show up as non-citizens in SAVE."[14]

103.    Federal courts similarly found that the citizenship data queried by the SAVE System was unreliable for voter eligibility checks. *See, e.g.*, *Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 261 (4th Cir. 2021) ("The Board determined that 97.6% of persons identified by the DMV as noncitizens, in fact were citizens, and that about 75% of individuals who later provided proof of citizenship continued to be listed as noncitizens in the SAVE system.").

> ii.    *The federal government rushed to develop a new SAVE System to purge noncitizen voters, despite existing safeguards against noncitizen voting.*

104.    In 2025, DHS dramatically and rapidly overhauled SAVE in an attempt to transform it into a database to verify voters' citizenship status ("Overhauled SAVE System"). This represents a significant departure from the traditional purpose of SAVE—to verify immigrant statuses solely for public benefits agencies.

105.    This rush to overhaul SAVE came in the face of existing, effective safeguards to protect against noncitizen voting.

106.    For instance, the NVRA requires state and federal voter registration forms to "include a statement that (A) specifies each eligibility requirement (including citizenship); (B)

---

[14] *Post Election Audit Report: General Election 2016*, N.C. State Bd. of Elections (Apr. 21, 2017), https://perma.cc/WH8U-RZ4B.

contains an attestation that the applicant meets each such requirement; and (C) requires the signature of the applicant, under penalty of perjury." *See* 52 U.S.C. §§ 20508(b)(2), 20505(a)(1)-(2); *see also id.* § 20504(c) (requiring state motor vehicle departments to include a voter registration application form as part of driver's license applications, with the same attestation and signature requirements to verify citizenship). In other words, every registered voter has attested to their status as a U.S. citizen upon registering to vote under penalty of perjury.

107. Moreover, any noncitizen who votes violates the law risking fines and prison time. *See* 18 U.S.C. § 611.

108. As a result of these effective safeguards, noncitizen voting is exceedingly rare.[15]

109. Despite the safeguards which successfully protect against noncitizen voting, the federal government created the Overhauled SAVE System in just a few weeks.

110. In response to the President's directives to DHS and SSA in Executive Order 14,248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 28, 2025) ("Elections EO"), the Overhauled SAVE System expanded SAVE in at least two ways.

111. *First*, user agencies could now "input Social Security numbers" to "help verify U.S. citizenship"—including of U.S.-born citizens—based on a "new partnership with the Social Security Administration" and DHS.[16]

112. *Second*, "for the first time, agencies can submit more than one case at a time," using a new bulk upload function to search millions of records at once.[17]

113. The Elections EO mandated that the overhaul of the SAVE System take place within just 30 days, for a system that has been otherwise slowly evolving over 30 years.

---

[15] Miles Parks, *Despite grand claims, a new report shows noncitizen voting hasn't materialized*, NPR (July 30, 2025),  https://perma.cc/9CC8-TRBE.
[16] Press Release, USCIS, USCIS Deploys Common Sense Tools to Verify Voters (May 22, 2025), https://perma.cc/HBZ5-RW2E.
[17] Jonathan Shorman, Trump wants states to feed voter info into powerful citizenship data program, Stateline (Aug. 15, 2025), https://perma.cc/A9ZU-SEKH.

114. To comply with this timeline, federal officials moved hastily, conducting any testing of the Overhauled SAVE System themselves and deploying it within two weeks of starting the project.[18]

115. According to USCIS, the Overhauled SAVE System first attempts to match a voter's information against the SSA's citizenship data based on social security number. If this data does not confirm that a voter is a citizen, SAVE then searches additional DHS databases.

116. But this data matching is prone to errors, stemming from SSA's unreliable citizenship data and the unreliable citizenship data in the DHS databases that the Original SAVE System relies on.

117. Brian Broderick, who leads the verification division of USCIS, even acknowledged that the system can't always find the most current citizenship information for people not born in the U.S.[19]

118. SAVE's inability to accurately verify the citizenship of non-U.S. born citizens was well-understood by DHS officials. USCIS, however, does not direct states to remove individuals from its voter rolls and indeed, disclaims responsibility for a state's reliance on that data to remove voters from the rolls. According to Broderick, "if we can verify citizenship, great," but "[i]f we can't, now it's up to [the User Agency] to determine whether to let this person on your voter rolls."[20]

### iii.    SSA has unreliable citizenship data.

119. SSA's citizenship data is unreliable, particularly for naturalized citizens, because SSA captures citizenship data from an individual from a snapshot in time when they apply for a SSN, which typically occurs before an individual naturalizes. If that snapshot changes after

---

[18] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH.
[19] *Id.*
[20] *Id.*

the individual applies for a SSN, and the person becomes a U.S. citizen by naturalization after they receive the SSN, the SSA does not automatically update their citizenship.[21]

120.    SSA's unreliable citizenship data is also likely to impact derived citizens, who are born outside of the United States and derive citizenship as children by operation of law when their parents naturalize because these individuals would have no reason to interact with SSA until they are ready to apply for Social Security benefits.

121.    SSA admitted in 2023 that because "the citizenship [data] SSA maintains merely represents a snapshot of the individual's citizenship status at the time of their interaction with SSA," its "records do not provide definitive information about an individual's citizenship status," and thus has cautioned against relying on SSA data to verify citizenship or immigration status. As SSA has explained, "SSA is not the agency responsible for making citizenship determinations" and "SSA is not the custodian of U.S. citizenship records."[22]

122.    A 2006 audit by SSA's Inspector General estimated that SSA's citizenship data inaccurately identified approximately 3.3 million U.S. citizens as noncitizens "because [they] had become U.S. citizens after obtaining their SSN" and "had not updated their records with SSA."[23]

123.    SSA also lacks complete citizenship data for citizens born in the United States prior to 1981, which is the year that SSA began consistently collecting citizenship information.[24] According to SSA, "SSA's assessment of its citizenship data indicates that approximately 1/4 of those records do not have an indication of citizenship present."[25] That means SSA likely does not have information about citizenship status for U.S.-born citizens older than

---

[21] Letter from SSA Off. of Gen. Counsel to Fair Elections Ctr., at 2 (July 13, 2023), https://perma.cc/KS2N-U2US ("Letter from SSA to Fair Elections Ctr.").

[22] Letter from SSA to Fair Elections Ctr., at 2 (July 13, 2023), https://perma.cc/KS2N-U2US.

[23] SSA Off. of the Inspector Gen., Cong. Resp. Rep. No. A-08-06-26100, Accuracy of the Social Security Administration's Numident File 13 (Dec. 18, 2006), https://oig-files.ssa.gov/audits/full/A-08-06- 26100_0.pdf.

[24] Letter from SSA to Fair Elections Ctr., at 2 (July 13, 2023), https://perma.cc/KS2N-U2US.

[25] *Id.* at 3.

their mid-forties unless they have subsequently filed for Social Security benefits or sought a new Social Security card.

### iv.    The original SAVE System had unreliable citizenship data.

124. Even for individuals whose information is included in the original SAVE System, the underlying information is fragmented across multiple agency databases that have never been fully integrated. This lack of integration particularly impacts naturalized, acquired, and derived citizens.

125. Naturalization records may appear in only one dataset, and certain files may exist only as paper records. Naturalized citizens interact with various government agencies at different stages of the immigration and naturalization processes and there is no system for updating each agency's records. As a result, even DHS data specifically about immigration and citizenship status has sometimes been outdated, with some records showing that an individual is a noncitizen long after they have naturalized.

126. In October 2025, DHS acknowledged that there is a risk that SAVE "may share inaccurate information with registered agencies, which could in turn impact a registered user agency's eligibility determination for an individual."[26]

127. The SAVE System data only "partially mitigates this risk," and "due to misspelling of names, transposed numbers, or incomplete information, the SAVE Program may produce inaccurate results."[27]

### v.    Cross checking SAVE citizenship data and SSA citizenship data does not make the data reliable.

128. Combining these two unreliable datasets does not transform them into one reliable dataset for verifying voters' citizenship.

129. The SAVE System data and SSA data do not have the same identifiers for searching their records, meaning that a social security number cannot be used to search the DHS databases

---

[26] 2025 SAVE PIA, at 19 (Oct. 31, 2025), https://perma.cc/G92ULYPM.
[27] *Id.*

queried by SAVE, and DHS-issued numeric identifier cannot be used to search SSA records.[28]

130.    As a result, "information about foreign-born U.S. citizens contained in USCIS naturalization databases may not be locatable when SSA is unable to confirm" U.S. citizenship.[29]

131.    Further, the SAVE System data from USCIS is not current or complete for people who were previously noncitizens, sought access to benefits and were therefore put into the SAVE System when they were noncitizens, and then became naturalized citizens after their information was put into the original SAVE System. As such, using the SAVE System data alongside SSA data in the Overhauled SAVE System only increases the potential for erroneous identification of noncitizens.

132.    Shortly after the new system was deployed and in use by multiple states, DHS had to correct information provided to at least five states after SAVE misidentified many voters as noncitizens. At least one state, Missouri, had already started its investigation into the results they received from SAVE when DHS officials informed them of the corrected information that adjusts SAVE's responses for many individuals from non-U.S. citizen to U.S. citizen.[30]

133.    In December 2025, Missouri's election integrity director asked USCIS officials why a voter SAVE identified in October as a noncitizen was identified in a subsequent search as a citizen. USCIS explained that some of the agency's most up-to-date citizenship information was not yet accessible by SAVE.[31]

134.    Shortly after, in January 2026, Missouri's secretary of state sent counties a "SAVE review update" of revised lists with reduced numbers of voters identified as noncitizens. This

---

[28] Letter from SSA to Fair Elections Ctr., at 2 (July 13, 2023), https://perma.cc/KS2N-U2US.
[29] Westat Report to DHS, Evaluation of the Accuracy of E-Verify Findings, at xii (July 2012), https://perma.cc/54EN-82KN.
[30] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH.
[31] *Id.*

update also instructed election administrators to move voters who had initially been flagged in error by SAVE back to active status on the voter rolls.[32]

135.    After the January revision, St. Louis County's initial list of purported noncitizens dropped from 691 to 133.[33]

136.    Even still, the Missouri secretary of state acknowledged the updated SAVE lists may not be final and refused to specify about what prompted the adjustments.[34]

137.    Election officials outside of Texas have expressed their concerns after SAVE identified voters, who were known to be citizens, as noncitizens. Seventy Missouri county clerks expressed this sentiment in a letter to Missouri state legislative leadership, saying that voters SAVE identified as noncitizens "regularly included 'individuals we know to be U.S. citizens – our neighbors, colleagues and even voters we have personally registered at naturalization ceremonies.'"[35] A South Carolina election official similarly expressed to federal officials that the information obtained from SAVE has "'raised more questions than it [has] answered.'"[36]

138.    In April 2026, despite solely relying on SAVE data for the Purge Program, Secretary Nelson raised concerns about the accuracy of the data in a letter to USCIS. Secretary Nelson stated she "want[ed] to make sure that you are using the most accurate data," and asked USCIS officials to notify her office if they were able to "confirm the citizenship of any individuals previously identified as non-citizens" in SAVE. Exhibit A-8, April 28, 2026 Letter from Secretary Nelson to USCIS Acting Associate Director.

---

[32] *Id.*
[33] *Id.*
[34] *Id.*
[35] Alexandra Berzon & Nick Corasaniti, *Initial Review Finds No Widespread Illegal Voting by Migrants, Puncturing a Trump Claim*, N.Y. Times (Jan. 14, 2026), https://www.nytimes.com/2026/01/14/us/politics/noncitizen-voters-save-tool.html.
[36] *Id.*

139. Upon information and belief, Secretary Nelson did not receive a response to the April 2026 letter and opted to continue facilitating the Purge Program in the face of concerns about the accuracy of the underlying data.

140. In June 2026, a federal court enjoined use of the updated SAVE system's bulk upload feature and inclusion of SSA data for voter verification, finding that use of the updated SAVE system for that purpose "knowingly trampled on the privacy rights of American citizens in a manner that threatens the sacred right to vote." *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 1:25-cv-03501-SLS, 2026 WL 1784297, at *1 (D.D.C. June 22, 2026), *appeal docketed*, No. 26-5243 (D.C. Cir. June 25, 2026).

### C. Texas fails to take basic steps to protect voters leading to a discriminatory Purge Program.

141. Texas has failed to take steps to protect voters from its implementation of the Purge Program. There are at least four ways in which the Secretary of State failed to take steps to mitigate the harm to voters and protect them from erroneous purges.

142. *First*, the Secretary of State has failed to use DPS data, which could have reduced the potential for erroneous purges.

143. The Purge Program puts the onus on the voter to provide documentary proof of citizenship based solely on the result of the fallible Overhauled SAVE System, even though the Secretary of State has access to DPS records potentially containing documentary proof of citizenship for any Texas resident who has a driver's license or state identification card. While this data is not always current (because, as discussed above, voters regularly naturalize after receiving their driver's license), it is a well-known source of citizenship verification for many Texas voters.

144. Before sharing the list of voters with counties, then-Secretary Nelson declined to conduct any investigation of flagged voters' citizenship on their own, despite the availability and ease of utilizing data from DPS to confirm whether any voters already provided proof of citizenship to DPS.

28

145. A spokesperson for the Secretary noted that their office had not reviewed any of SAVE's citizenship determinations before sending lists to the counties based on the assertion that the secretary's office is not an investigative agency.[37]

146. DPS, which issues driver's licenses and state identification cards, is supposed to keep records of the proof of citizenship that registrants provide, such as birth certificates or passports and also records of proof of lawful presence in the U.S., such as green cards, provided by immigrants.

147. Texas law allows both U.S. citizens and lawfully present noncitizens of Texas to obtain Texas driver's licenses and state identification cards. All driver's license and identification card applicants must present proof of citizenship or legal presence and proof of residency in Texas.

148. Texas also requires proof of citizenship from anyone registering to vote while obtaining a driver's license or state identification card.

149. According to DPS, "[t]hese requirements are actually programmed into our system, and they can't be bypassed by an employee." As a result, if a person does not meet the documentary proof of citizenship requirement, that person does not "get presented with the voter registration question" and cannot register to vote with DPS.[38]

150. The Secretary of State's office previously acknowledged that it "regularly obtains data from [DPS] on noncitizens and compares it to the statewide voter registration database" before sharing those records with counties to conduct additional investigation and remove potential noncitizens.[39]

151. This is, in fact, the Secretary of State's obligation under both consent decree and statute.

---

[37] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH.
[38] Natalia Contreras, *Texas counties look into 'potential noncitizens' on voter rolls. Here's what they're finding*, VoteBeat Texas (Oct. 31, 2025), https://perma.cc/JL6P-JTVK.
[39] Press Release, Texas Sec'y of State, Texas Leads the Way Against Noncitizen Voting (Aug. 12, 2024), https://perma.cc/W9YB-4LKK.

Deleted: Defendant
Deleted: of State

152.   Since September 2021, in accordance with the consent decree in *LULAC v. Whitley*, the Secretary of State's office has followed a structured data-matching process to identify and remove noncitizens from the voter rolls that relies on the secretary's use of DPS data.[40]

153.   Under current Texas law, the provision addressing cancellation because of citizenship status instructs that registrars "shall consider only a voter's [citizenship] information in the database of the Department of Public Safety that was derived from documents presented by the voter to the department *after* the person's current voter registration became effective, and may not consider information derived from documents presented by the voter to the department before the person's current voter registration became effective." Tex. Elec. Code § 16.0332(a-1) (emphasis added).

154.   The Secretary's office, therefore, is both capable of and aware of the benefit of using the appropriate DPS data to investigate the citizenship status of purported noncitizens before transmitting such information to the counties.

155.   Further, the Secretary understands the importance of relying on data collected only *after* a person registered to vote and attested that they were a United States citizen, rather than using outdated data when identifying registered voters for potential removal based on citizenship status.

156.   Nonetheless, the Secretary of State did not consult DPS data—a known source that could confirm citizenship for many registered voters—before placing the burden on the voter to provide documentary proof of citizenship or risk being purged from the voter rolls, while using a federal tool known to rely on stale data.

157.   Multiple counties—such as Travis, Potter, and Randall counties—did, however, consult DPS data and confirmed the citizenship for many flagged voters on their lists.

158.   Since the Purge Program was implemented, several Texas counties have reported significant numbers of voters who were included on the State's Purge Lists despite having

**Deleted:** Defendant

---

[40] *Election Advisory No. 2021-11*, Texas Sec'y of State (Sep. 9, 2021), https://perma.cc/HX9B-PLJQ.

registered to vote with DPS. For example, in Collin County, 59 of the 109 people flagged by the State had done so. In Bexar County, 39 of the 201 voters flagged had registered at DPS. And in Brazoria County, nearly half of the 48 individuals flagged had registered at DPS.

159.   Had Texas compared the SAVE results to the documentary proof of citizenship on file with DPS, many or all of these voters likely would not have been flagged for investigation and removal because they were required to verify their citizenship during the voter registration process at DPS.

160.   When Travis County requested assistance from the Secretary of State with comparing the Purge Lists with DPS data, the Secretary of State was slow to respond to these requests and reluctant to facilitate access to the DPS data.

161.   *Second*, the Secretary of State has seemingly failed to engage in the additional verification of the Purge Lists as the Memorandum of Agreement between Defendant and USCIS requires. Under the Memorandum of Agreement, the Secretary of State, as the User Agency, must "institute additional verification when required by SAVE for any registrant or registered voter that does not verify as a naturalized or acquired citizen on initial verification, including in all cases where the User Agency receives any SAVE response other than that of naturalized or acquired citizen." *See* Exhibit A-3, Memorandum of Agreement, Dep't of Homeland Security and Texas Sec'y of State (March 17, 2025). The Secretary of State has never confirmed that it engaged in the additional verification procedures SAVE requires for initially unverified responses.

162.   *Third*, the Secretary of State failed to vet the new SAVE System's accuracy in any way, despite the many concerns with its accuracy. Instead, Texas was the very first state to deploy the Overhauled SAVE System as a tool to purge voters.[41]

---

[41] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH.

**Deleted:** Defendant

**Deleted:** Defendant

**Deleted:** C

**Deleted:** Defendant

**Deleted:** Defendant

163. *Fourth*, Defendant fails to respond to questions or needs from election officials, many of whom have expressed frustration with the Secretary's lack of guidance and failure to help with investigations.[42] *See infra* Section III.

**III. County level implementation of the Purge Program is chaotic and not uniform, in violation of the NVRA.**

164. Since its October 2025 launch, Texas's Purge Program has been fraught with confusion and miscommunication, leading to a fractured and non-uniform implementation.

165. Then-Secretary Nelson "directed counties to treat" the Purge List as "weak matches [for identity] in order to ensure that counties conducted their own investigation."[43]

166. In treating any potential matches as "weak," in other contexts—such as when removing deceased or duplicate registrants—counties "may not immediately cancel any voter's registration simply because they are identified as a potential non-U.S. citizen[.]"[44]

167. But the term "weak match" is not defined in the context of the Purge Program. Since its October 2025 launch of the Purge Program, the Secretary of State has not identified statutory or administrative authority upon which counties can rely to determine what constitutes a weak match in the context of the Purge Program itself.

168. Further, the Secretary of State's office provided no clear guidance on when or how to conduct investigations into the Purge Lists, despite knowing that investigation would be needed, because SAVE would not yield accurate results.

169. To the contrary, the directive contradicts itself. On the one hand it says the records "must be treated as weak matches" that should merit further investigation, but on the other it says that, absent other evidence to the contrary, the mere presence of a voter on a Purge List

---

[42] *Id.*

[43] *See* Jude Joffe-Block, *Trump's SAVE tool is looking for noncitizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025), https://perma.cc/QC7L-XQZU.

[44] *Election Advisory No. 2021-11*, Texas Sec'y of State (Sep. 9, 2021), https://perma.cc/HX9B-PLJQ.

Deleted: Defendant

Deleted: Defendant
Deleted: of State

Deleted: Defendant

Deleted: Defendant
Deleted: State

"provides a county with reason to believe that the voter is no longer eligible for registration" that can trigger a removal notice and, after 30 days, removal.[45]

170.  But counties in Texas received only Purge Lists, without any of the underlying documentation or search results that contributed to a voter's inclusion on the list.[46]

171.  County election officials did not receive any information from the Secretary of State indicating whether additional verification procedures were followed before the list of voters was compiled and conveyed to the counties.

172.  Some election officials in Texas were concerned about SAVE's accuracy, especially given that counties would be canceling voters' registrations "without really knowing how names have shown up on the SAVE database."[47]

173.  After telling county clerks and election officials—who were in the middle of managing early voting for the November 2025 elections—that they should have already received more details on the Purge Lists, multiple officials complained that they had not been contacted and were just now hearing about lists of flagged voters.

174.  In response to this lack of clear guidance and poor timing, counties' non-uniform approaches to the Purge Program took three forms: some counties took no action in response to the Purge Lists; others sent notice letters to those on the Purge Lists with no investigation; others undertook investigations and purged voters.

175.  *First*, some counties engaged in no investigation whatsoever and sent SAVE Non-Citizenship Notices to all voters on the lists within days of Secretary of State's October 21, 2025 guidance email to counties without any effort to verify the SAVE results relayed on the Purge Lists.[48] Among those counties include Defendant counties Collin, Dallas, and Denton.

---

[45] *Id.*

[46] Declaration of Christopher Davis, *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 1:25-cv-03501-SLS (D.D.C. Oct. 29, 2025), ECF No. 47-1.

[47] Natalia Contreras, *Texas counties look into 'potential noncitizens' on voter rolls. Here's what they're finding.*, VoteBeat Texas (Oct. 31, 2025), https://perma.cc/JL6P-JTVK.

[48] *Id.*

---

**Deleted:** Defendant

**Deleted:** Defendant

**Deleted:** Brazoria,

**Deleted:** ¶
Brazoria County sent Notice letters to all 48 voters flagged on their Purge List to demand they provide proof of citizenship, without any investigation beforehand. Brazoria County's Elections Chief Deputy confirmed that all 48 Notices were sent out, at the latest, by October 29, 2025, less than 7 business days after the secretary of state notified counties of their Purge Lists. *See* Exhibit H, Email from Brazoria County to VoteBeat (Nov. 20, 2025).¶
As of December 11, only 3 of Brazoria County's 48 flagged voters had responded to the Notice letter by providing proof of citizenship, leaving a large portion of Brazoria's Purge List vulnerable to being purged from the voter rolls.…

176. Collin County sent all its Notice letters on October 22, 2025, just one day after the State sent Collin its Purge List.

177. Dallas County sent its Notice letters to over 100 voters on October 23, 2025, without conducting any preliminary investigation of the citizenship status of flagged voters.

178. Denton County sent out SAVE Non-Citizenship Notices on October 22, 2025, days after Secretary of State sent Defendant Denton County a Purge List of 84 people, and only one day after the Secretary of State's email to investigate Purge Lists.[49] Based on when it sent out the Notices, Defendant Denton County had no time to independently investigate the 84-person Purge List.

179. Fifty-six people in Denton County have had their registration cancelled after not responding to the SAVE Non-Citizenship Notice, including five people whose Notices came back as undeliverable and likely received no Notice of their registration cancellation. Given the many people who have proven citizenship in Denton County, Defendant Frank Philips himself stated "What is bugging me is I think our voter rolls may be more accurate than this database . . . My gut feeling is more of these are citizens than not."[50]

180. *Second*, in the absence of clear State guidance, some counties did not act on the Purge Lists that they received from Secretary of State, instead waiting for more direction.[51]

181. Harris County was among those counties that took no action in response to the Purge List. Harris County recognized that acting on the Secretary of State's Purge List would constitute a violation of federal law. Harris County explained that "[t]he NVRA imposes a list maintenance moratorium for 90 days prior to a federal election," and Harris County had been subject to the "NVRA moratorium since early August 2025" due to upcoming

---

[49] *See* Camila Gonzalez, *Denton County has 84 possible noncitizens registered to vote, state says. Most have never voted*, Denton Rec.-Chron. (Oct. 23, 2025), https://perma.cc/M6X7- MK2Z.

[50] Jen Fifield & Zach Despart, *A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas.*, The Texas Trib. (Feb. 13, 2026), https://perma.cc/XKE2-YMNQ.

[51] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH.

---

**Deleted:** Defendant

**Deleted:** Defendant

**Deleted:** <#>In Brazoria, Collin, Dallas, and Denton counties, election officials were aware that many of the flagged voters had registered to vote at DPS yet failed to take the investigative step of verifying with DPS whether those voters had provided proof of citizenship when they registered. ¶

**Deleted:** <#>Defendant

**Deleted:** Defendant

congressional races. *See* Exhibit A-9, Letter from Annette Ramirez, Harris County Tax Assessor-Collector & Voter Registrar to Campaign Legal Center (Feb. 18, 2026).

182.    *Third*, other counties engaged in the difficult task of investigating the Purge Lists with no meaningful guidance from the Secretary of State.[52] For example, Travis County sought DPS data on its flagged voters and was able to confirm that 11 of the 97 voters flagged by SAVE had already proven their citizenship to DPS. In Potter County, DPS confirmed citizenship for three of the nine flagged voters. In Randall County, DPS verified that one in five of the flagged voters had a U.S. passport. In Lubbock County, election officials gave notice to voters of their placement on the SAVE list but did not remove the voters unless they either affirmed non-citizenship or indicated non-citizenship on their initial registration (and therefore, the error was in the processing of their registration). Indeed, several counties, including Denton, used the list to re-review the initial registration forms and identify any self-identified noncitizens that were improperly registered by election officials.[53] This, of course, is an entirely appropriate and limited use of the SAVE data that Plaintiffs do not challenge.

183.    As a result of the lack of guidance and conflicting instructions from the Memorandum, counties' investigations proceeded non-uniformly. Most counties relied simply on sending out mailed Notices to voters requesting they provide proof of citizenship within 30 days, while others verified potential SAVE matches against Texas's DPS data, which revealed that many of the flagged voters had already provided proof of citizenship, because they registered at DPS or provided proof of citizenship when applying for a driver's license or identification card.

---

[52] *Id.*
[53] Jen Fifield & Zach Despart, *A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas.*, The Texas Trib. (Feb. 13, 2026), https://perma.cc/XKE2-YMNQ.

| | |
|---|---|
| **Deleted:** I | |
| **Deleted:** Defendant | |

184. According to the Executive Director of the Texas Association of County Election Officials, the Secretary of State sent counties Purge Lists "without any real strict guidance on what the process should be or what resources they should use to do the research."[54]

**IV.    The Purge Program unlawfully purges U.S. citizens.**

185. Texas is home to many naturalized, acquired, and derived citizen voters, who are at risk of being erroneously flagged on one of the Secretary of State's Purge Lists.

186. As of March 2026, Texas has over 18.7 million registered voters, including tens of thousands who have registered since November 2025.[55]

187. As of 2024, roughly 2.2 million eligible voters in Texas—approximately 11% of the State's eligible voters—were foreign-born U.S. citizens.[56]

188. In fiscal year 2024 alone, over 79,000 Texans naturalized as U.S. citizens, and over 625,000 did so between 2016 and 2023.[57]

189. Predictably, these voters were impacted by Texas's Purge Program. As a result of Defendant's Purge Lists, in late 2025, numerous naturalized, acquired, and derived citizens were swept into an attempted purge of noncitizens using SAVE data, including "foreign-born children who acquired citizenship from parents who naturalized," a fact pattern that is common and yet is also "known to stump SAVE."[58]

190. In one county, a voter who had become a naturalized citizen in 2021 was unlawfully purged. After voting in the November 2025 election, this citizen received a "Notice of Cancellation of Voter Registration" in December 2025. The Notice stated that the citizen's

---

[54] Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://perma.cc/QC7L-XQZU.

[55] Press Release, Texas Sec'y of State, Secretary Nelson announces 18.7 million registered voters for the March 3 primary (Feb. 17, 2026), https://perma.cc/VL3W-YTJS.

[56] Katherine Schaeffer, *1 in 10 eligible voters in the U.S. are naturalized citizens*, Pew Rsch. Ctr. (Sep. 19, 2024), https://perma.cc/B3LS-FH2A.

[57] *Naturalization Statistics*, USCIS (Jan. 24, 2025), https://perma.cc/X3T9-5CJS.

[58] Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR (Dec. 10, 2025), https://perma.cc/QC7L-XQZU.

**Deleted:** Defendant

**Deleted:** Defendant

registration was canceled due to a failure to respond to a "Notice of Examination" mailed to the citizen by the office over 30 days ago. But this citizen had never received a Notice of Examination. In February 2026, the citizen called the county's election office to ask for a copy of the Notice of Examination. The office told the citizen to submit a written public records request. After the citizen submitted the request and called the office twice, an employee confirmed that the office had no record of sending a Notice of Examination. When the citizen called the office a third time, an employee told the citizen that their name had appeared on a Purge List of suspected noncitizens that the county office had received from the Secretary of State. The citizen subsequently learned that SSA data, which SAVE relies on, is outdated and lists them as a noncitizen.

191.    The Boone County Clerk quickly realized that the Purge List she received contained inaccurate information, after she noticed that the voter registration form for the second person on the list bore the initials of a member of her staff who helped register the person at their naturalization ceremony. More than half the voters on Boone County's Purge List, the County discovered, were U.S. citizens.[59]

192.    Out of the 84 flagged registered voters in Denton County, 14 had already proven their citizenship as of December 10, 2025.[60]

193.    Voter Doe, a Common Cause member, was forced to prove their citizenship. They had been a naturalized citizen for fifteen years when they received the Notice indicating that Defendant Phillips had "received information from the Texas Secretary of State reflecting that [they] might not be a United States citizen." Voter Doe did not know why they were being flagged for removal, despite being an eligible voter that registered during an interaction with DPS. They were fearful that they were being targeted for removal from the voter rolls because they were born outside of the United States.

---

[59] Jen Fifield & Zach Despart, *"Not Ready for Prime Time." A Federal Tool to Check Voter Citizenship Keeps Making Mistakes.*, ProPublica (Feb. 13, 2026), https://perma.cc/LG9X-YRYH.
[60] *See* Jude Joffe-Block, *Trump's SAVE tool is looking for non-citizen voters. But it's flagging U.S. citizens too*, NPR (Dec. 10, 2025), https://perma.cc/QC7L-XQZU.

**Deleted:** Defendant

**Deleted:** <#>One of those citizens who was forced to prove her citizenship commented, "'I'm here legally, and everything I've done has been per the law,' she said. 'I really have no idea why I had to prove it.'"[61]¶

194. Upon information and belief, Voter Doe was flagged for removal because the SAVE system contained stale data indicating that they were a non-U.S. citizen and neither Defendant Phillips nor the Secretary of State used the DPS data in their possession to verify their citizenship. They are worried that they will receive another removal notice or be prevented from voting because Defendants appear to be relying on inaccurate SAVE data indicating that they are a non-U.S. citizen.

195. In some smaller counties, most of the flagged voters were properly registered U.S. citizens. In Moore County, six of eleven flagged voters confirmed their eligibility; in Erath County, two of the three flagged voters confirmed citizenship; and in Potter County, three of the nine flagged voters had proof of citizenship on file with DPS. The error rates are staggering.

196. All of Duval County's three flagged voters turned out to be U.S. citizens, prompting the County's election administrator to acknowledge that "I really find no merit in any of this."

197. In Collin County, at least ten voters have confirmed their citizenship.

198. In other counties, including Dallas and Bell County, voters responded to Notices within the narrow 30-day window to provide documentary proof of citizenship and stop the county from purging their registration. Counties purged those who failed to respond in time.

199. Hunt County sent Notice letters to voters on its Purge List one day after the Secretary of State's Directive to investigate, and later cancelled the registrations of at least five voters, including one who later provided proof of citizenship.

200. After finding that several voters flagged as noncitizens not only were citizens but had also actually already provided that information to a state agency, the Travis County Tax Assessor-Collector and Voter Registrar referred to the process of verifying these registrations as "'confirmation that SAVE is not a reliable resource.'"[62] SAVE, according to the Registrar "has proven to be inaccurate[.]"[63]

---

[62] Natalia Contreras, *Some registered voters Texas flagged as "potential noncitizens" had already shown DPS proof of citizenship*, The Texas Trib. (Dec. 18, 2025), https://perma.cc/JBW3-NSVD.
[63] Jen Fifield & Zach Despart, *A federal tool to check voter citizenship keeps making mistakes. It led to confusion in Texas*, The Texas Trib. (Feb. 13, 2026), https://perma.cc/XKE2-YMNQ.

201. Several Texas counties reported finding that many of the flagged voters had registered at DPS and provided proof of citizenship in doing so. In Collin County, 59 of 109 flagged voters had registered at DPS. In Bexar County, 39 of 201 flagged voters had registered at DPS. If these counties consulted with DPS, given DPS's stated practices, they almost certainly would confirm the eligibility of many if not all of those individuals.

202. That U.S. citizens would be purged from the rolls was an expected result, as acknowledged by the Denton County Elections Administrator, who anticipated that some Notice letters will not be delivered, and many voters will ignore letters they receive. The Administrator admitted that if such voters "are citizens, their registration is going to get canceled, but it shouldn't be[.]"[64]

203. Many counties conducted no investigation outside of sending Notice letters, which puts a large portion of those on the Purge List—many of whom are likely eligible U.S. citizens— at risk of being purged from the rolls when Notice letters go undelivered or unanswered.

V.    **Plaintiffs provided timely notice to the Secretary of State and the County Defendants that the Purge Program violates the NVRA.**

204. On January 15, 2026, LULAC, Texas LULAC, and LULAC Council 102, through their counsel, sent a letter via certified mail and email to Secretary Nelson, notifying her that the State of Texas was failing to meet its obligations under Section 8 of the NVRA. LULAC, Texas LULAC, and LULAC Council 102, through their counsel, also sent the letter to county clerks in Collin, Dallas, and Denon Counties. *See* Exhibit A-10, Letter from Campaign Legal Center to Jane Nelson, Texas Sec'y of State (Jan. 15, 2026).

205. On February 24, 2026, Common Cause of Texas sent a substantially similar letter to Secretary Nelson and the same county clerks. *See* Exhibit A-11, Letter from Campaign Legal Center to Jane Nelson, Texas Sec'y of State (Feb. 24, 2026).

| Deleted: Brazoria, |
| Deleted: J |

| Deleted: K |

---

[64] Natalia Contreras, *Texas Counties look into 'potential noncitizens' on voter rolls. Here's what they're finding*, VoteBeat Texas (Oct. 31, 2025), https://perma.cc/JL6P-JTVK.

206. These letters stated that Plaintiffs were providing notice of their intent to sue for the violations of Section 8 of the NVRA described unless the violations were corrected within the notice period prescribed by the NVRA.

207. Upon information and belief, Defendants have not taken the steps necessary to remedy the State's and counties' noncompliance with Section 8 of the NVRA.

208. More than twenty days have elapsed since LULAC, Texas LULAC, LULAC Council 102, and Common Cause's NVRA notice letters were sent.

209. At the time that the notices were sent, the next "election for Federal office" in Texas would occur on March 3, 2026, which was less than 120 days from when the notices were sent.[65]

210. Plaintiffs have therefore provided adequate pre-suit notice pursuant to 52 U.S.C. § 20510(b)(2). *See Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 355 n.2 (5th Cir. 1999) ("'A person who is aggrieved by a violation' of the Act may commence a civil action for declaratory or injunctive relief if the violation is not corrected within 90 days after receipt of notice of the violation, or within 20 days after receipt of notice if the violation occurred within 120 days before the date of a federal election." (citation omitted).

**VI.    Plaintiffs sent a timely request to the Secretary of State to provide the public Texas voter list.**

211. On January 14, 2026, Plaintiffs, through their counsel, sent a records request to the Secretary of State, seeking copies of records pertaining to the Secretary's "efforts to verify the citizenship status of registered voters or voter registration applicants and/or to remove noncitizens from the voter rolls, including but not limited to names identified by the federal government's Systematic Alien Verification for Entitlements, or 'SAVE,' program." *See* Exhibit A-12 at 2, Open Records Request from Campaign Legal Center (Jan. 14, 2026).

212. The request was made pursuant to the Public Disclosure provision of the NVRA, 52 U.S.C. § 20507(i), and the Texas Public Information Act, Tex. Gov't Code Chapter 552.

---

[65] *See* Texas Sec'y of State, Important Election Dates 2026, https://perma.cc/MW3P-WAHF (last visited Mar. 25, 2026).

> **Deleted:** <#>On February 2, 2026, Brazoria County responded to Plaintiffs' notice letter. *See* Exhibit L, Letter from Joyce Hudman, Brazoria County Clerk to Campaign Legal Center (Feb. 2, 2026).¶
> In their response, Brazoria County claimed they had "not undertaken a blind purge," but could not "comment on how the Secretary of State composed" the Purge List. Defendant Hudman noted that in their "investigation we were unable to verify the citizenship status of any name" on the secretary of state's Purge List, but failed to explain what other investigate efforts, if any, the County took aside from mailing Notice letters requiring voters to provide proof of citizenship. ¶

> **Deleted:** Defendant

> **Deleted:** Defendant

> **Deleted:** Defendant

> **Deleted:** M

213.    Plaintiffs' requests included: (1) "The full publicly available voter file information for any individuals identified by the SAVE system as potential non-citizens who have had their registrations cancelled or rejected. This portion of the request should include any individuals so identified after January 1, 2025"; (2) "The full publicly available voter file information for any individuals identified by the SAVE system as potential non-citizens who have since confirmed their U.S. citizenship. This portion of the request should include any individuals so identified after January 1, 2025"; and (3) "The full publicly available voter file information for any individuals identified by the SAVE system as potential non-citizens whose registration status remains pending. This portion of the request should include any individuals so identified after January 1, 2025." Exhibit A-12 at 2-3, Open Records Request from Campaign Legal Center (Jan. 14, 2026).

214.    On January 29, 2026, the Secretary of State responded that "(1) responding to the Request will require programming or manipulation of data; and (2) the information responsive to the Request can be made available only at a cost that covers the programming and manipulation of data." *See* Exhibit A-13 at 3, Letter from Adam Bitter, General Counsel, Texas Sec'y of State to Campaign Legal Center (Jan. 29, 2026). The letter requested $360 for these fees.

215.    On February 3, 2026, Plaintiffs' counsel wrote to state that they would "accept the estimated charges for this records request."

216.    Plaintiffs' counsel paid the fees, and the Secretary of State's General Counsel acknowledged receipt of payment via email on February 5, 2026. The email also stated that the Office would begin processing Plaintiffs' requests.

217.    On February 20, 2026, the Secretary of State's Office wrote to Plaintiffs' counsel to inform them that "[w]e are continuing to process the Request" and "require more time to review our records and produce responsive information. We will provide you responsive documents on a rolling basis—to the extent such information is not excepted from disclosure under state or federal law—with the first production by 5:00 p.m. on February

41

**Deleted:** M

**Deleted:** Defendant

**Deleted:** N

**Deleted:** Defendant

**Deleted:** Defendant

27, 2026." *See* Exhibit A-14 at 3, Letter from Adam Bitter, General Counsel, Texas Sec'y of State to Campaign Legal Center (Feb. 20, 2026).

218. On the same day, the Secretary of State's Office sent a letter to the Office of the Attorney General, explaining that the Secretary had received a request for information from Plaintiffs' counsel. *See* Exhibit A-15, Letter from Adam Bitter, General Counsel, Texas Sec'y of State to Office of the Attorney General (Feb. 20, 2026).

219. In the letter to the Attorney General, Secretary of State sought a decision as to whether any exceptions apply to Plaintiffs' public records request under Texas law, specifically under Sections 552.101, 552.103, 552.107, 552.111, and 552.139 of the Texas Government Code, which pertain to not releasing information relevant to ongoing investigations. *Id.*

220. On February 27, 2026, the Secretary of State's office sent communications to Plaintiffs' counsel stating that "the Office asserts that certain information responsive to the Request is excepted from disclosure under the Public Information Act" and was requesting "a ruling from the Attorney General regarding a release of these records." *See* Exhibit A-16, Letter from Adam Bitter, General Counsel, Texas Sec'y of State to Campaign Legal Center (Feb. 27, 2026); Exhibit A-17 at 7, Letter from Adam Bitter, General Counsel, Texas Sec'y of State to Office of the Attorney General (Feb. 27, 2026).

221. In the letter to the Attorney General, the Secretary of State's office stated "[t]he responsive documents also contain information that is protected from disclosure" because they request social security numbers of living persons. *See* Exhibit A-17 at 2 n.2, Letter from Adam Bitter, General Counsel, Texas Sec'y of State to Office of the Attorney General (Feb. 27, 2026).

222. Notably, Plaintiffs requested *publicly* available versions of the voter list, not a version that would include social security numbers or other sensitive information.

223. Plaintiffs' request also specifically included the records of individuals who provided proof of citizenship and cannot be the subject of any further investigation.

**Deleted:** O

**Deleted:** Defendant

**Deleted:** Defendant

**Deleted:** P

**Deleted:** Defendant

**Deleted:** Defendant

**Deleted:** State

**Deleted:** Q

**Deleted:** R

**Deleted:** Defendant

**Deleted:** State

**Deleted:** R

224. On February 27, 2026, Defendant disclosed some records responsive to Plaintiffs' January 14 request, but none of these records were responsive to Plaintiffs' three requests for individual voter records for those identified for removal.

225. In the February 27, 2026 letter, the Secretary of State stated that the Office would disclose "additional responsive documents on a rolling basis—to the extent such information is not excepted from disclosure under state or federal law—with the first production by 5:00 p.m. April 14, 2026." *See* Exhibit A-16, Letter from Adam Bitter, General Counsel, Texas Sec'y of State to Campaign Legal Center (Feb. 27, 2026).

226. Plaintiffs have not received any additional productions from the Secretary and have never received any version of the public voter registration list information for the voters identified for removal under the Purge Program from the Secretary.

227. Upon information and belief based on these exchanges, the Secretary of State has taken the position that the requested public versions of the voter list information for the targeted voters are excluded from disclosure under state law but has made no statement about availability under the NVRA.

228. The Secretary of State took a different approach in response to the federal government's request for voter registration lists.

229. On August 7, 2025, the United States Department of Justice ("DOJ") wrote to the Secretary of State invoking this same Public Disclosure provision. *See* Exhibit A-18, Letter from U.S. Dep't of Just. to Texas Sec'y of State (Aug. 7, 2025).

230. DOJ wrote that "[t]he NVRA requires each state and the District of Columbia to make available for inspection 'all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters.'" *Id.* at 1.

231. As DOJ pointed out in its letter "[c]ourts have continuously found that Section 8(i) requires the disclosure of voter registration records." *Id.* at 1.

43

**Deleted:** Defendant

**Deleted:** Q

**Deleted:** <#>On March 18, 2026, Plaintiffs' counsel received an Attorney General response letter to Brazoria County regarding a similar request for records from Plaintiffs. In that response letter the Attorney General confirmed that "[t]he secretary's office states that the submitted information pertains to election complaints. The Secretary's office also states that it was still evaluating the complaints at the time of the request and had not made any determination regarding whether the complaints did or did not warrant investigation." Based on those representations, the Attorney General advised Brazoria County that the requested voter information for the flagged voters—including for voters who have already proven their citizenship—is "not considered public information." *See* Exhibit S at 3, Letter from Office of Attorney General to Brazoria County Criminal District Attorney's Office (Mar. 3, 2026).¶

**Deleted:** Defendant

**Deleted:** Defendant

**Deleted:** Defendant

**Deleted:** T

232.    On August 21, 2025, the Secretary of State responded to DOJ, explaining that "With respect to your request for the statewide voter registration list, the Office will provide you with publicly available information for all individuals who are registered to vote in Texas as of the date on which the data is extracted from our system." *See* Exhibit A-19 at 3, Letter from Adam Bitter, General Counsel, Texas Sec'y of State to U.S. Dep't of Just. (Aug. 21, 2025).

233.    The Secretary of State did not take the position that any of the requested voter registration lists violated any state laws and therefore could not be disclosed.

234.    On July 6, 2026, LULAC, Texas LULAC, and LULAC Council 102, through their counsel, sent a letter via certified mail and email to the Texas Secretary of State , notifying her that the State of Texas was failing to meet its obligations under Section 8(i) of the NVRA by failing to disclose the requested information.

235.    This letter stated that Plaintiffs were providing notice of their intent to sue for the violations of Section 8(i) of the NVRA described unless the violations were corrected within the notice period prescribed by the NVRA.

236.    The July 6, 2026 letter was sent within 120 days of the Federal election on November 3, 2026.

**CLAIMS FOR RELIEF**

**Count One**

**Violation of Section 8(b) of the National Voter Registration Act, 52 U.S.C. § 20507(b)(1)**
(52 U.S.C. § 20510)

237.    Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

238.    Section 8(b)(1) of the NVRA requires that voter list maintenance programs be "uniform" and "nondiscriminatory." 52 U.S.C. § 20507(b)(1). This provision protects against list maintenance programs that are not uniformly applied or that discriminate against, among

44

Deleted: Defendant

Deleted: U

Deleted: Defendant

others, naturalized citizens, including through matching names against the federal SAVE System. *See Mi Familia Vota v. Fontes*, 129 F.4th 691, 714-15 (9th Cir. 2025).

239. "The term 'uniform' is intended to mean that any purge program or activity must be applied to an entire jurisdiction."[66]

240. Texas's Purge Program is not uniform and therefore violates Section 8(b)(1) of the NVRA.

241. Counties across Texas are applying the Texas's Purge Program in disjointed, non-uniform ways. Some counties took no action in response to the Purge List; others sent Notices to those on the Purge Lists with no investigation; others undertook investigations and purged voters. Defendant Texas Secretary of State took insufficient action to ensure that counties would conduct list maintenance in a manner that was both non-discriminatory and uniform, including by failing to make DPS data available to counties and instructing each county to consult DPS citizenship data before removing voters (or doing that investigation itself before providing Purge Lists to each county).

242. Texas's Purge Program is discriminatory and therefore violates Section 8(b)(1) of the NVRA.

243. The Purge Program targets and will disproportionately sweep in naturalized, acquired, and derived citizens, as they are much more likely than U.S.-born citizens to be flagged as noncitizens in the SAVE System based on outdated data, in violation of Section 8(b)(1).

244. The only way for a citizen born in the United States to be flagged through Texas's Purge Program would be through an inadvertent error that is equally likely to affect a naturalized citizen.

245. In contrast, naturalized, acquired, and derived citizens are subject to an additional and significantly greater risk of disenfranchisement from which U.S.-born citizens are shielded because the Purge Program was designed to rely on stale SAVE data that does not accurately reflect voters' current status as naturalized citizens.

---

[66] S. Rep. No. 103-6, 103rd Cong., at 31 (1993).

45

246. Texas's Purge Program places a heightened burden on those voters and significantly increases the likelihood of their disenfranchisement.

247. This requirement prohibits list-maintenance programs that disproportionately burden or target protected classes of eligible voters, including foreign-born U.S. citizens. Citizenship-based matching programs relying on databases known to contain stale or unreliable citizenship data—as the SAVE System does—pose heightened risks to naturalized citizens, who were previously noncitizens and therefore are more likely to be erroneously flagged when government records fail to reflect updated citizenship status. *See Mi Familia Vota*, 129 F.4th at 714-15.

248. Texas's Voter Purge Program violates the NVRA's nondiscrimination requirement because it mandates list maintenance programs that rely on databases or systems known to contain stale or unreliable citizenship data, and does not require cross-referencing with data in the State's own possession (such as through the Texas DPS) that could be more recently updated as a guard against improper removals of U.S. citizen voters.

249. Texas's Voter Purge Program will raise substantial risks of disenfranchisement that will discriminatorily burden naturalized citizen voters or foreign-born U.S. citizen voters.

250. The Texas Purge Program therefore establishes a voter list maintenance program that is neither uniform nor nondiscriminatory, in violation of Section 8(b)(1) of the NVRA, 52 U.S.C. § 20507(b)(1).

251. The Texas Purge Program thereby subjects naturalized citizen voters, including Plaintiffs' members, to the irreparable harm of facing unlawful discrimination on the basis of their status as naturalized citizens.

## Count Two
**Violation of Section 8(i) of the National Voter Registration Act, 52 U.S.C. § 20507(i)**
(52 U.S.C. § 20510)

252. Plaintiffs repeat and reallege the allegations contained in the preceding paragraphs as if fully set forth herein.

253. The Public Disclosure provision of the NVRA provides that states "shall maintain for at least 2 years and shall make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered." 52 U.S.C. § 20507(i)(1). The Public Disclosure provision covers individualized records for registered voters subject to removal programs. *See PILF v. N.C. State Bd. of Elections*, 996 F.3d 257 (4th Cir. 2021); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012); *see also* 52 U.S.C. § 20507(i)(2).

254. Defendant Secretary of State has thus violated the Public Disclosure provision of the NVRA by refusing to provide Plaintiffs with the list of voters identified as potential noncitizens within a reasonable time period despite having those records in her office's possession at the time Plaintiffs requested these records.

255. No state or federal law prevents Defendant Secretary of State from complying with the Public Disclosure provision because Plaintiffs requested only a publicly available version of the voter lists including for those individuals who had confirmed their U.S. citizenship.

256. Defendant Secretary of State's continuing refusal to provide the requested records up to and including the time of filing of this lawsuit is unlawful.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter a judgment providing the following relief:

1. Declare that Texas's SAVE Voter Purge violates Sections 8(b) of the NVRA.

2. Permanently enjoin Defendants from implementing and enforcing the SAVE Voter Purge Program, including but not limited to:

(1) prohibiting Defendant Secretary of State from sending county election officials Purge Lists of voters to remove based on information in the Overhauled SAVE System without sufficient further, uniform investigation; and

(2) prohibiting Defendants from removing individuals from the voter registration list solely because they have been flagged as noncitizens by the SAVE System.

3. Order Defendant Counties to place back on the rolls any persons who were removed from the rolls as a result of implementation of the Purge List, until such time as it can be conclusively proved that such voters are not currently U.S. citizens.

4. Order Defendant Secretary of State to issue a directive to counties to place back on the rolls any persons who were removed from the rolls solely on the basis of the Purge List, until such time as it can be conclusively proved that such voters are not currently U.S. citizens.

5. Order Defendant Secretary of State to provide access to the public voter registration list, including the requested lists of targeted voters, as required under the Public Disclosure provision of the NVRA.

6. Grant Plaintiffs their fees, costs, and expenses, including reasonable attorneys' fees pursuant to 52 U.S.C. § 10310(e) and 42 U.S.C. § 1988.

7. Grant Plaintiffs such additional and further relief as this Court deems just and proper.

Dated: July 29, 2026                    Respectfully submitted,

**Deleted:** March 26

*/s/ Alexis Grady*
Alexis Grady

Dicky Grigg
(Texas Bar # 08487500)
Attorney at Law
Law Office of Dicky Grigg, PC
1900 Pearl Street
Austin, TX 78705
Tel: (512)474-6061
Fax: (512)582-8560
dicky@grigg-law.com
mel@grigg-Law.com

Danielle Lang*
Anna Baldwin*
Sejal Jhaveri*
Renata O'Donnell*
Alexis Grady*
Daniel Brophy*
Campaign Legal Center
1101 14th St. NW, Suite 400
Washington, DC 20005
Tel: (202)736-2200
Fax: (202)736-2222
dlang@campaignlegalcenter.org
abaldwin@campaignlegalcenter.org
sjhaveri@campaignlegalcenter.org
rodonnell@campaignlegalcenter.org
agrady@campaignlegalcenter.org
dbrophy@campaignlegalcenter.org

*Admitted Pro Hac Vice

Counsel for Plaintiffs League of United Latin
American Citizens; Texas League of United
Latin American Citizens; League of United
Latin American Citizens Council 102; and
Common Cause